UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

7-ELEVEN, INC.,

        Plaintiff,

-vs-                            Case No. 6:08-cv-2091-Orl-28GJK

JANE L. GEORGE, SARAH'S BIG TREE
GAS & GO, LLC, ANTHONY BAILEY,
SARAH G'S HOLDINGS, LLC, BIG PARK
HOLDINGS, LLC, BIG TREE DAYTONA
PROPERTIES, LLC, and CLYDE
MORRIS BIG TREE HOLDINGS, LLC,

        Defendants.

## ORDER

This diversity case brought by 7-Eleven, Inc., against two individual Defendants and five limited liability companies ("LLCs") arises from a franchise agreement for a convenience store. 7-Eleven brings claims of unjust enrichment, conversion, and conspiracy against all Defendants; a claim of breach of contract against Sarah's Big Tree Gas & Go, LLC ("SGG") only; and a claim of breach of guaranty against Jane George only. (Am. Compl., Doc. 8; Supplemental Compl., Doc. 40). Additionally, SGG has filed a counterclaim against 7-Eleven for breach of the franchise agreement. (Am. Countercl., Doc. 42).

Now pending is 7-Eleven's Renewed Motion for Summary Judgment (Doc. 175), in which 7-Eleven seeks summary judgment on its claims of unjust enrichment, conversion,

and conspiracy and on SGG's counterclaim.[1] No response to the motion has been filed by any Defendant. Having considered the motion and the evidence in the record, the Court concludes that the motion must be granted.

## I. Factual and Procedural Background

The individual Defendants—Jane George and Anthony Bailey—are husband and wife, having married in December 1998. (See Bailey August Dep.[2] at 13).[3] The five LLC Defendants—SGG; Sarah G's Holdings, LLC; Big Park Holdings, LLC; Big Tree Daytona Properties, LLC; and Clyde Morris Big Tree Holdings, LLC—are entities owned and controlled by George or Bailey or both.[4]

---

[1] At the beginning of its motion, 7-Eleven states that it is moving for summary judgment "on all claims in this action" and mentions all five of its claims as well as SGG's counterclaim. (Doc. 175 at 1-2). However, 7-Eleven's claims for breach of contract and breach of guaranty are not mentioned again or argued in the motion, and on the last page 7-Eleven asks that the Court "[d]eny relief on any and all other claims and counterclaims in this action." (Id. at 19). The Court construes 7-Eleven's motion as seeking judgment on the three claims and one counterclaim argued and as abandoning 7-Eleven's claims for breach of contract and breach of guaranty.

[2] Bailey was deposed on August 18, 2009, and on November 9, 2009. The August 2009 portion of the deposition (Docs. 106 & 107, continuously paginated) is denoted in this Order as "Bailey August Dep." followed by the page number. The November 2009 deposition (Doc. 74-3) is denoted in this Order as "Bailey November Dep." followed by the page number. George was also deposed on two days—August 19, 2009 (Docs. 103, 104, & 105) and November 10, 2009 (Doc. 74-4). Her deposition is continuously paginated and will therefore be denoted merely by "George Dep." followed by the page number.

[3] Despite being married, both George and Bailey have at times identified themselves as unmarried in legal documents such as real estate deeds. (See, e.g., Bailey November Dep. at 26; Warranty Deed and Mortgage Deed, Doc. 176-5 at 1-5).

[4] SGG was owned and operated by George. (Bailey August Dep. at 43; George Dep. at 149-50). Prior to 2009, Sarah G's Holdings was owned 50% by George and 50% by Bailey, but Bailey became 100% owner in 2009. (See Bailey August Dep. at 18-19, 42; George Dep. at 145-46). Bailey was the sole member and manager of Big Park Holdings,

In July 2007, George entered into a franchise agreement ("the Agreement") with 7-Eleven under which George was to operate a 7-Eleven convenience store ("the store"). (See Agreement, Ex. A to Doc. 25). With 7-Eleven's consent, in August 2007 George assigned the Agreement to SGG. (Assignment, Ex. A to Agreement). SGG began operating the store in October 2007 on property owned by Sarah G's Holdings on Clyde Morris Boulevard in Daytona Beach, Florida.

In the Agreement, 7-Eleven agreed to establish an open account for SGG, and SGG agreed to pay 7-Eleven any unpaid balance in that open account upon termination of the Agreement or as provided elsewhere in the Agreement. (Agreement ¶ 13(a)). 7-Eleven was to credit to the open account any amounts it owed to SGG, and 7-Eleven was to debit from the open account all purchases, operating expenses, and amounts SGG owed 7-Eleven related to the operation of the store. (Id.). An SGG bank account at Wachovia Bank ending in the numbers 8816 ("the 8816 account") was used for the open account described in the Agreement. As explained by Paul Hanson, a 7-Eleven senior director of accounting, 7-Eleven could make deposits into and withdrawals from the 8816 account but could not otherwise access that account or observe its balance or activity in it. (Hanson Dep.[5] at 233).

Each day at the store, a cash report was completed and electronically transmitted to

---

LLC. (See Bailey August Dep. at 37). Bailey solely owned Big Tree Daytona Properties, LLC, either outright or through Sarah G's Holdings. (Id. at 34). Bailey was also the manager and owner of Clyde Morris Big Tree Holdings, LLC. (Id. at 41).

[5]The deposition of Paul Hanson is contained in the record as Exhibit A to Doc. 77 (Docs. 77-2 through 77-5) and is continuously paginated.

7-Eleven.[6] The amount of the day's credit card transactions was indicated on that cash report. Thinking that credit card transactions were being paid to 7-Eleven rather than to SGG and that it was supposed to be processing and paying the amount of daily credit card transactions to SGG, 7-Eleven regularly deposited the amount of each day's credit card transactions into the 8816 account.[7] However, in November or December 2008—more than a year after SGG had begun operating the store—7-Eleven realized, through the implementation of new software, that when customers made credit card purchases at the store the amounts of those transactions were being paid directly to SGG and not to 7-Eleven. In other words, there was no need for or obligation of 7-Eleven to pay the credit card transaction amounts to SGG, and SGG had been getting paid twice for each credit card transaction for more than twelve months. By the time 7-Eleven realized the error, 7-Eleven had deposited a total of $4,954,614.16 into the 8816 account for credit card transactions. (See Padgett Decl., Doc. 26, & Ex. A thereto). 7-Eleven attempted to reverse those deposits from the 8816 account in order to rectify the error, but the 8816 account did not contain sufficient funds for such a reversal. (Padgett Decl. ¶ 4).

Shortly after realizing its depositing mistake, on December 15, 2008, 7-Eleven attempted to reach George and asked that she and Bailey meet with 7-Eleven personnel the next morning. (First Jenkins Decl., Doc. 25, ¶ 5). George did not respond to that request.

---

[6]The cash report was completed and transmitted daily by Bailey, though Bailey was not employed by SGG. (Bailey August Dep. at 20, 43; George Dep. at 159).

[7]These deposits appear on the bank statements for the 8816 account as "automated credit 7-Eleven Inc." along with the amounts of each deposit. (See Doc. 176-1).

(Id.). 7-Eleven management personnel then attempted to meet with George and Bailey on December 16 by going to the store, where they encountered Bailey. (Id. ¶ 6). Bailey left the store after they arrived. According to 7-Eleven, the corporate personnel approached Bailey but Bailey refused to speak with them, left the store, and "made no indication that he ever intended to return." (Id.). According to Bailey, the personnel did not ask to speak with him and he left because he had an appointment at the dentist. (Bailey August Dep. at 184-85).

7-Eleven personnel repeatedly called George on December 16 and left her messages to call them, but George did not respond. (First Jenkins Decl. ¶ 7). George acknowledged in her deposition that she received a voice message from 7-Eleven on December 16 and that she did not return the call. (See George Dep. at 261). 7-Eleven also sent George a letter by e-mail and U.S. mail that day—and posted the letter at her residence in Ormond Beach, Florida—but George did not respond to that letter in any way. (First Jenkins Decl. ¶ 7; Letter, Ex. B to First Jenkins Decl.). 7-Eleven sent George a formal notice of default under the Agreement, (First Jenkins Decl. ¶ 8; Notice of Default, Ex. C to First Jenkins Decl.), and filed this lawsuit the next day—December 17, 2008. (Compl., Doc. 1).

Investigation revealed that throughout 2008—while 7-Eleven was mistakenly making deposits into the 8816 account for credit card transactions—money was periodically withdrawn or transferred out of the 8816 account, largely to another Wachovia account identified by a number ending in 9190 ("the 9190 account") to which 7-Eleven did not have any access. During 2008, transfers were made from the 8816 account to the 9190 account in the following amounts: January—$25,000; February—$100,000; March—$230,000; April—$100,000; May—$250,000; June—$400,000; July—$250,000; August—$260,000;

September—$430,000; October—$300,000; and November—$200,000. (See 8816 Bank Statements, Doc. 176-1). Additionally, in January a $350,000 "counter withdrawal" was made from the 8816 account. (See Doc. 176-1 at 9).

Meanwhile, Bailey and the LLCs were making substantial[8] purchases. On March 10, 2008, Bailey purchased a $550,000 home in Ormond Beach, Florida, giving Sarah G's Holdings a $400,000 mortgage and paying $150,000 at closing using funds from Sarah G's Holdings. (See Doc. 176-5 at 3 to 7). On May 27, 2008, Bailey purchased a Mercedes automobile for just over $63,000 using at least $57,000 in funds from Sarah G's Holdings. (See Doc. 176-4). And, on June 27, 2008, Big Tree Daytona Properties purchased a vacant lot adjacent to the store for over $1 million, granting a mortgage to a bank for $641,065.00. (See Doc. 176-6).

In their depositions, George and Bailey maintained that they had asked 7-Eleven at the beginning of the franchise why the deposits were being made into the 8816 account and that 7-Eleven had assured them that they money was "theirs." (See, e.g., George Dep. at 37, 61; Bailey August Dep. at 91, 98). Bailey explained that "[o]nce he didn't get an answer that [he] could understand [regarding why those deposits were being made], [he] was happy just the way it was" and "was happy because they said it was [his]." (Bailey August Dep. at

---

[8] George and Bailey might take issue with the Court's use of the word "substantial" to describe these purchases. (See, e.g., Bailey August Dep. at 8 ("Q. A couple hundred thousand dollars isn't much money to you? A. Everything is relative."); George Dep. at 248 (responding, in discussing transfers of $100,000, $150,000, $250,000, $80,000, and $100,000, that such amounts are a lot of money "[f]or some people")). Nevertheless, the Court stands by its characterization of these purchases as "substantial" for descriptive purposes.

97-98).[9] Upon being shown accounting reports at his deposition, Bailey recognized that SGG was being paid twice for some transactions. (Id. at 180-81). However, he testified that he did not intend to return the money that the store was double-paid because 7-Eleven told him that the money was his. (Id. at 182). George testified that she did not intend to return the money until 7-Eleven proved that there had been a mistake. (George Dep. at 226-27).

In January 2010, the state attorney in Volusia County, Florida, filed a criminal complaint against George and Bailey, charging them with grand theft (a first-degree felony), money laundering (a first-degree felony), and structuring transactions to evade reporting or registration requirements (a third-degree felony). Those charges arise from the events described in this Order. (See Charging Aff., Doc. 177-1). After those charges were filed, the parties jointly moved to stay this case in light of the ongoing criminal proceedings, and that motion was granted. (See Mot., Doc. 112; Order, Doc. 115). George and Bailey pleaded no contest to those charges in early 2013, and in March 2013 each was sentenced to concurrent prison terms of ninety months, ninety months, and sixty months, respectively, on the three counts. (See Request for Judicial Notice, Doc. 163, & Exs. thereto). George and Bailey also were ordered to pay, jointly and severally, restitution of $4,954,614.16 to 7-Eleven. (See id.).

This Court reopened this case in April 2013, (see Doc. 159), and trial was reset for December 2013, (see Doc. 161). After summary judgment motions were submitted by both

---

[9]When asked whether he ever sent written confirmation to 7-Eleven regarding the money being theirs, Bailey responded, "Does cashing it count?" (Bailey August Dep. at 107).

sides, the parties filed a Notice of Settlement (Doc. 168) in October 2013. Pursuant to that Notice of Settlement, on October 15, 2013, the Court denied all pending motions as moot and dismissed the case subject to the right of the parties to move for entry of judgment or for re-opening of the case for good cause shown within sixty days thereof. (Order, Doc. 169). Within that sixty-day period, on December 10, 2013, 7-Eleven moved for entry of judgment or alternatively to reopen the case, asserting that George had refused to sign a stipulated judgment contemplated by the settlement. (Doc. 170). After Defendants responded to that motion, (see Doc. 171), the Court reopened the case, (Order, Doc. 172), held a status conference, (Mins., Doc. 174), and gave the parties two weeks to file renewed motions for summary judgment, (id.). 7-Eleven filed its renewed motion for summary judgment (Doc. 175) within that two-week period. None of the Defendants has filed a renewed summary judgment motion or responded to 7-Eleven's renewed motion, which is ripe for ruling.

Additionally, two days after 7-Eleven filed its renewed motion for summary judgment, the assigned magistrate judge granted Defendants' counsel's motion to withdraw. (See Doc. 179). In that Order, the magistrate judge noted that counsel had demonstrated good cause to withdraw as counsel for the individual Defendants and that the LLC Defendants had had sufficient time to secure substitute counsel but had failed to do so. (Id. at 4). The magistrate judge directed the Clerk to enter defaults against the five LLC Defendants, (id.), and the Clerk has done so, (see Docs. 185 through 189).

II. Discussion

A. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). A "district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed but, rather, must consider the merits of the motion." United States v. One Piece of Real Prop., 5800 S.W. 74th Ave., Miami, Fla., 363 F.3d 1099, 1102 (11th Cir. 2004).

B. The Merits of 7-Eleven's Motion

In its renewed motion, 7-Eleven seeks summary judgment on its claims for unjust enrichment, conversion, and conspiracy and on SGG's counterclaim for breach of the franchise agreement. 7-Eleven's motion is well-taken as to each of these claims.

1. Claims Against George and Bailey

In Counts I and II of its Amended Complaint, 7-Eleven brings claims of unjust

-9-

enrichment and conversion against all of the Defendants. As correctly argued by 7-Eleven, the criminal convictions of George and Bailey for grand theft establish 7-Eleven's claims of unjust enrichment and conversion against them.

As noted earlier, George and Bailey pleaded no contest in state court to charges of grand theft, money laundering, and structuring transactions to evade reporting or registration requirements, and the state court has adjudicated them guilty, sentenced them to prison, and entered restitution orders against them requiring payment by them, jointly and severally, to 7-Eleven of $4,954,614.16. (See Doc. 163 & Attachs.). Section 775.089, Florida Statutes, which provides for court orders of restitution to crime victims, states in part that "[t]he conviction of a defendant for an offense involving the act giving rise to restitution under this section shall estop the defendant from denying the essential allegations of that offense in any subsequent civil proceeding." § 775.089(8), Fla. Stat. This subsection bars a defendant "from challenging in the civil action those matters that were actually and necessarily adjudicated in the criminal proceeding." Peterson v. Therma Builders, Inc., 958 So. 2d 977, 979 (Fla. 2d DCA 2007).

Both George and Bailey were convicted of grand theft under section 812.014, Florida Statutes. This crime consists of "knowingly obtain[ing] or us[ing], or endeavor[ing] to obtain or to use, the property of another with intent to, either temporarily or permanently . . . [d]eprive the other person of a right to the property or a benefit from the property." § 812.014(1), Fla. Stat. "The elements of a claim for unjust enrichment are: (1) plaintiff conferred a benefit on the defendant; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the

defendant to retain the benefit without paying the value thereof to the plaintiff." Porsche Cars N. Am., Inc. v. Diamond, 140 So. 3d 1090, 1100 (Fla. 3d DCA 2014). And, "[a] conversion claim is based on a 'positive, overt act or acts of dominion or authority over the money or property inconsistent with and adverse to the rights of the true owner.'" Columbia Bank v. Turbeville, No. 1D13-2750, 2014 WL 3029868, at *3 (Fla. 1st DCA July 7, 2014) (quoting S.S. Jacobs Co. v. Weyrick, 164 So. 2d 246, 250 (Fla. 1st DCA 1964)). Because the elements of unjust enrichment and conversion are subsumed by the elements of grand theft, the convictions of George and Bailey for grand theft estop them from challenging 7-Eleven's unjust enrichment and conversion claims.

Furthermore, even aside from the criminal convictions, based on the record evidence in this case there is no genuine issue of material fact remaining as to the claims of unjust enrichment and conversion against Bailey and George. 7-Eleven has established through competent evidence that it mistakenly transferred $4,954,614.16 to SGG's 8816 account and that Bailey and George exercised dominion over those funds and refused to return the money. 7-Eleven is thus entitled to summary judgment against Bailey and George on Counts I and II of the Amended Complaint.[10]

---

[10] In addition to the criminal convictions and record evidence, 7-Eleven also relies in part on the fact that Bailey and George invoked the Fifth Amendment during a hearing before the magistrate judge in this case; their depositions were not completed because of the invocation of their right to remain silent. 7-Eleven urges the Court to draw an adverse inference against George and Bailey due to their silence, but the Court finds it unnecessary to base its summary judgment ruling on such an inference.
    "The general rule is that an adverse inference may be drawn against a party in a civil action when he refuses to testify in response to probative evidence against him." TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC, 945 F. Supp. 2d 1331, 1339 (M.D. Fla. 2013) (citing Baxter v. Palmigiano, 425 U.S. 308, 317-18 (1976)). Such an adverse inference

In Count III of the Amended Complaint, 7-Eleven brings a claim of conspiracy, alleging that the Defendants "agreed and conspired to convert the mistakenly-deposited funds and conceal the location or disposition of funds from 7-Eleven." (Doc. 8 at 5). 7-Eleven relies in part on George's and Bailey's convictions for money laundering in support of this count. In this vein, George and Bailey were adjudicated guilty of violating section 896.101, Florida Statutes, which provides in part:

> It is unlawful for a person . . .
> (a) Knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity:
> 1. With the intent to promote the carrying on of specified unlawful activity; or
> 2. Knowing that the transaction is designed in whole or in part:
> a. To conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
> b. To avoid a transaction reporting requirement or money transmitters' registration requirement under state law.

§ 896.101(3)(a), Fla. Stat. On the other hand, "'[a] civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by

---

against George and Bailey could also be extended to the LLCs under the circumstances of this case. See SEC v. Monterosso, 746 F. Supp. 2d 1253, 1263-64 (S.D. Fla. 2010).

   This adverse inference, however, "'does not substitute for evidence needed to meet the burden of production'" required to obtain summary judgment." TemPay, 945 F. Supp. 2d at 1339 (quoting Avirgan v. Hull, 932 F.3d 1572, 1580 (11th Cir. 1981)). Nevertheless, when "a party seeking summary judgment produces additional direct evidence above and beyond any negative inference to be drawn by the invocation of the Fifth Amendment, entry of summary judgment is appropriate." Id. In this case, the record evidence supports summary judgment in 7-Eleven's favor even aside from any adverse inference that might arise from George's and Bailey's silence.

unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" Charles v. Fla. Foreclosure Placement Ctr., LLC, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (quoting Raimi v. Furlong, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)).

This Court does not find the convictions for money laundering in and of themselves sufficient to support civil liability for conspiracy as alleged in Count III of the Amended Complaint. As noted above, a conspiracy requires "an agreement between two or more parties," and money laundering does not. Nevertheless, the record evidence in this case establishes that 7-Eleven is entitled to summary judgment on its conspiracy claim against George and Bailey.[11] George and Bailey plainly acted in concert to retain and conceal the money that 7-Eleven had mistakenly deposited into the 8816 account. Summary judgment is therefore warranted on the conspiracy count.

2. Claims Against the LLC Defendants

7-Eleven's claims of unjust enrichment, conversion, and conspiracy are brought not only against George and Bailey but also against the LLC Defendants. The record supports summary judgment for 7-Eleven against the LLC Defendants on these claims as well.

The LLC Defendants were not charged in the criminal case in state court, but the guilt of George and Bailey, who admittedly owned and controlled the LLCs, is evidence of the liability of the LLCs as well. Even aside from the criminal convictions of the individual

---

[11] 7-Eleven also relies on George's and Bailey's invocations of the Fifth Amendment in support of its motion with regard to Count III. As noted with regard to Counts I and II, however, the Court finds it unnecessary to rely on an adverse inference in order to conclude that 7-Eleven is entitled to summary judgment on Count III.

Defendants, the evidence establishes the liability of the LLC Defendants on all three counts. It is clear that George and Bailey—and no one else—owned and controlled the LLC Defendants and used the LLC Defendants to commit conversion and conspiracy and to become unjustly enriched. Bailey testified in his deposition that funds were commingled and shuffled around among the LLCs. (See, e.g., Bailey November Dep. at 65 ("Our money was disbursed amongst all our corporations to make our entities run.")). Bailey's testimony and the documentary evidence—including real estate documents and bank statements—demonstrates transfers of money among the LLCs and use of the LLCs to effectuate the charged conduct at issue here. Summary judgment against all of the LLCs is warranted on all three claims.

### 3. SGG's Counterclaim

7-Eleven also seeks summary judgment on SGG's counterclaim, in which SGG alleges that 7-Eleven "materially breached and repudiated its duties and obligations under the Franchise Agreement by failing to comply with the notice and cure provisions in the Cure Notice and Section 26 of the Franchise Agreement." (Doc. 42 at 10). This counterclaim is based on the events of December 16, 2008, when 7-Eleven personnel went to the store to attempt to speak to George and Bailey about the mistaken deposits. SGG alleges that at that time, 7-Eleven seized possession of the store and removed equipment and fixtures that were essential to the operation of the store and that it did so without giving SGG an opportunity to cure. (Id.).

In its summary judgment motion, 7-Eleven asserts that it acted properly on December 16, 2008, because it was exercising its rights as a secured creditor. 7-Eleven notes that

SGG executed a Security Agreement (Ex. 1 to Second Jenkins Decl., Doc. 164) in August 2007, in which SGG granted 7-Eleven a security interest in goods, including equipment, fixtures, and inventory at the store, and that section 6 of that Security Agreement authorized 7-Eleven to, upon an event of default,[12] "enter onto any property where any Collateral is located and take possession of such collateral without judicial process."

As noted earlier, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. And, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo, 131 F.3d at 999. In response to 7-Eleven's summary judgment motion, SGG has not come forward with any evidence at all in support of its counterclaim. 7-Eleven is thus entitled to summary judgment on this claim as well.

4. Constructive Trust

In its motion, 7-Eleven explains that it has requested the imposition of a lien and a constructive trust over property and proceeds of Defendants' conversion. 7-Eleven notes that among that property is the Ormond Beach residence acquired by Bailey in March 2008, and Bailey sold that property during his criminal case and voluntarily relinquished the net

---

[12]The Security Agreement defines "Event of Default" as "(i) a Material Breach; (ii) . . . failure to perform or observe any term, promise, condition or obligation contained in this Security Agreement; or (iii) . . breach of any representation or warranty made by you to us in or in connection with the Store, the Franchise Agreement, or this Security Agreement." (Security Agreement at 1).

proceeds of that sale to the trust account of 7-Eleven's attorneys; the proceeds remain in that trust account. (See Doc. 175 at 17-18; Doc. 178). 7-Eleven asks that a constructive trust be formally imposed against those proceeds—in the amount of $298,507.93—in order to foreclose any claim by Defendants to those proceeds later. 7-Eleven states that once the trust is imposed, it will assume control of those funds and issue a partial satisfaction of the judgment. The Court will impose a constructive trust as requested by 7-Eleven. Once judgment is entered, 7-Eleven shall issue a partial satisfaction of the judgment after assuming control of those funds.

5. Judgment

7-Eleven has established entitlement to summary judgment on the claims argued in its motion. As discussed earlier, restitution has already been ordered against Bailey and George in the state court criminal case. "An order of restitution [under section 775.089, Florida Statutes,] will not bar any subsequent civil remedy or recovery, but the amount of such restitution shall be set off against any subsequent independent civil recovery." § 775.089(8), Fla. Stat. Thus, any award against Bailey and George must account for, and be offset by, the prior criminal restitution order. The net judgment against Bailey and George will therefore be only for the amount of prejudgment interest on $4,954,614.16—$1,643,271.30[13]—whereas the judgment against the LLC Defendants will be for both the prejudgment interest amount and the principal amount of $4,954,614.16.

---

[13]The Court has calculated the amount of prejudgment interest in accordance with section 55.03, Florida Statutes, with annual interest rate adjustments from the date of loss—December 16, 2008—through September 4, 2014.

-16-

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. 7-Eleven's Renewed Motion for Summary Judgment (Doc. 175) is **GRANTED** as to 7-Eleven's claims of unjust enrichment (Count I), conversion (Count II), and conspiracy (Count III) and as to the counterclaim of Sarah's Big Tree Gas & Go, LLC. 7-Eleven's other claims are deemed abandoned. Sarah G's Big Tree Gas & Go, LLC, shall take nothing on its counterclaim, and 7-Eleven shall take nothing on its claims of breach of contract and breach of guaranty.

2. The Clerk is directed to enter a judgment providing that 7-Eleven, Inc., shall recover from Defendants Jane George, Anthony Bailey, Sarah's Big Tree Gas & Go, LLC, Sarah G's Holdings, LLC, Big Park Holdings, LLC, Big Tree Daytona Properties, LLC, and Clyde Morris Big Tree Holdings, LLC, jointly and severally, the sum of $1,643,271.30, which sum shall bear interest from the date of judgment at the statutory rate; and that 7-Eleven, Inc., shall further recover from Defendants Sarah's Big Tree Gas & Go, LLC, Sarah G's Holdings, LLC, Big Park Holdings, LLC, Big Tree Daytona Properties, LLC, and Clyde Morris Big Tree Holdings, LLC, jointly and severally, the sum of $4,954,614.16, which sum shall bear interest from the date of judgment at the statutory rate.

3. The Court hereby imposes a constructive trust in favor of 7-Eleven over the $298,507.93 in proceeds from the sale of the real property located at 73 Foxcroft Run, Ormond Beach Florida, that is currently being held in the trust account of Quarles & Brady LLP. Those funds shall be paid to 7-Eleven forthwith, and upon 7-Eleven's receipt of those funds the constructive trust shall be terminated and 7-Eleven shall file an appropriate partial

satisfaction of judgment.

    4.  After entry of judgment as set forth herein, the Clerk shall close this case.

    **DONE** and **ORDERED** in Orlando, Florida, this ____4____ day of September, 2014.

                                         JOHN ANTOON II
                                         United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party